IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH KAY BADBACK,<br><br>Defendant. | **MEMORANDUM OPINION AND ORDER**<br><br>Judge Dee V. Benson<br><br>Case No.: 2:07-CR-813 |

This motion arises out of the alleged improper entry, arrest, search, and seizure of Defendant Kenneth Badback. Defendant argues that because police entered his home without a warrant, his arrest was unlawful and all evidence discovered as a result of the warrantless entry should be suppressed. The Court held an evidentiary hearing on March 5, 2008. Timothy Root and Marcelino Toersbijns, police officers for the Bureau of Indian Affairs, Ute Mountain Ute Reservation in Utah and Colorado, provided testimony. The United States was represented by Trina Higgins. The Defendant was represented by Richard Mauro.

**Findings of Fact**

On November 1, 2007, at approximately 8:49 p.m., Officer Timothy Root of the Bureau of Indian Affairs ("BIA") received a radio dispatch reporting a shooting or shots fired in the White Mesa portion of the Ute Mountain Ute Reservation. Transcript of Evidentiary Hearing, at 9, [hereinafter "Tr."]. Officer Root arrived in White Mesa at approximately 9:11 p.m., but took no immediate action regarding the dispatch. (Tr. 11.) At 9:27 p.m., Officer Root received

another call from dispatch informing him that Annie Lee Rabbit, a resident of White Mesa,
needed to see an officer over a report that Defendant Kenneth Badback had been at her residence
intoxicated.

When Officer Root arrived at the residence of Ms. Rabbit, which is house number 24 on
Cowboy Street in White Mesa, Ms. Rabbit informed him that Badback had been at her residence
intoxicated and kicking at the door. (Tr. 12.) Ms. Rabbit said that she could hear Badback
yelling, and it appeared that he wanted to see Ms. Rabbit's granddaughter, Kerlyn Dutchie, who
is Badback's girlfriend and resides at the home. *Id.* Ms. Rabbit and Ms. Dutchie refused to
answer the door and simply ignored Badback's requests to enter. *Id.* According to Ms. Rabbit,
Badback then went around the back of the house and began firing rounds from a gun. *Id.*

A few hours later, at approximately 11:52 p.m., Officer Root was stationed a short
distance from Cowboy Street on Beaver Lane, when he heard three or four gun shots fired from
the Cowboy Street area. (Tr. 13-14.) Officer Root immediately called the San Juan County
Sheriff's Department for assistance. (Tr. 14.) After calling for assistance and while still
stationed on Beaver Lane, Officer Root was approached by Larry Begay. *Id.* Mr. Begay told
Officer Root that the man he was looking for was Kenneth Badback. (Tr. 15.) Mr. Begay
explained that Badback was the son of Mary Begay, Mr. Begay's sister, and was currently at her
home on Mesa View Drive, near Cowboy Street. *Id.* Mr. Begay stated that upon hearing gun
shots coming from his sister's home, he entered her home to find Badback present and reloading
a gun. (Tr. 15-16.) Fearing for the safety of his sister, Mr. Begay physically removed her and a
small child from the home. *Id.*

2

Officer Root was then approached, at approximately 12:18 a.m., by Dexter Whisker, a corrections officer with the BIA. (Tr. 33.) Officer Whisker explained that he lived near Mary Lee Begay on Mesa View Drive, *id*., and that he had earlier seen and heard Badback fire a couple shots or rounds while at the residence of Mary Lee Begay. (Tr. 16.)

After speaking with Officer Whisker, Officer Root proceeded to a meeting with several other officers from the area in order to devise a plan of how to deal with the situation. (Tr. 27-29.) This meeting took place one mile north of Badback's home and included officers from the BIA, two special agents from the FBI, and officers from the San Juan County Sheriff's Office. (Tr. 17, 27-29.) The acting chief decided that the officers present, including Officer Root, should go to Badback's residence and attempt to make contact. (Tr. 28, 63.) The officers arrived at Badback's home at approximately 12:27 a.m. They turned on their vehicle lights and sounded a bull horn in an attempt to get Badback's attention. After one hour, however, they had still received no response from Badback. *Id*.

At 1:30 a.m., Chief Marcelino Toersbijns, the acting police chief of the Ute Mountain Ute Agency in November 2007, arrived at the scene and took charge of the investigation. (Tr. 42.) Chief Toersbijns was briefed by Officer Root regarding all that had transpired to that point, including the information obtained from Ms. Rabbit, Mr. Begay, and Officer Whisker. (Tr. 37, 44.) Chief Toersbijns was also informed by other officers present that Badback had a history of violence while intoxicated and that he had fought with police in the past. (Tr. 46-47.) He was also provided with information regarding potential weapons that Badback might have in his possession. It was reported that Badback could have a rifle and possibly an assault rifle, though that report was never verified. (Tr. 47.) It was verified, however, that Badback was in

possession of a handgun.  *Id*.  In addition, a criminal history check was completed on Badback and it was determined that he had been previously convicted of a felony.  *Id*.

After receiving all this information, Chief Toersbijns tried to initiate contact with Badback.  He did this by having one of the San Juan County deputies attempt to make verbal contact over the public announcement system in the police unit, and by engaging the siren in order to alert Badback; at least six attempts of this nature were tried, all with no response of any kind from Badback.  (Tr. 48.)  Dispatch also made attempts to telephone Badback inside the residence, but received no answer.  (Tr. 49.)

After all of these attempts to make contact failed, Chief Toersbijns and the other officers present determined that Badback "was a danger to the community and that [they] had to come up with a solution on how to get this done peacefully and with minimal risk to [the] officers."  (Tr. 49.)  At that point, some of the officers were able to obtain a partial visual into a room on the right side of the home where they could see Badback sleeping.  (Tr. 49, 51-52.)  It was then decided that as long as the officers could maintain some type of visual on Badback, they would enter the home and seize him.  (Tr. 49.)

An entry plan was devised, with the BIA acting as the primary entry team and the San Juan County Sheriff's Office securing the perimeter.  (Tr. 49.)  At approximately 2:30 a.m., the officers moved in.  (Tr. 50.)  Before entering the home, however, the officers decided to disable the porch light of the residence.  (Tr. 49.)  This had the effect of losing any visual the officers had on Badback.  *Id*.  With no visual confirmation that Badback was still asleep, Chief Toersbijns called off the attempted entry and the officers retreated.  *Id*.

The officers decided to once again gather and devise a new plan. (Tr. 50.) This time they met at the Education Building in White Mesa, just a short distance from Badback's home. (Tr. 52.) After some discussion about Badback's failure to respond to the public announcement system, the sirens, and the telephone calls, the officers determined that Badback was likely not just asleep, but passed out. (Tr. 51-52.) Based on this determination, the officers decided that it would be safest to enter the home immediately, before Badback awoke. (Tr. 52.) Chief Toersbijns testified that he was concerned that with the approaching daylight a crowd would begin to gather, adding to the dangerousness of the situation. (Tr. 51-53.) Therefore, the officers decided to make another attempt at entering the home before daylight. (Tr. 52.)

Although the officers never discussed the possibility of obtaining a warrant before entering Badback's home, Chief Toersbijns testified that he clearly thought about it but decided against it. (Tr. 50-51.) The officers did not have cell phone coverage in White Mesa and Chief Toersbijns explained that from his seventeen years of experience, he believed it would take far too long to obtain a warrant. (Tr. 38, 51, 69.)[1] With daylight approaching and the possibility that Badback might awaken, Chief Toersbijns testified that for the safety of his officers and the public, he ordered the officers to enter Badback's home without a warrant. (Tr. 52.)

At approximately 3:50 a.m., the officers kicked in the door to the house and entered. (Tr. 36, 53.) As they did so, they did not announce their presence nor identify themselves for fear of waking Badback. (Tr. 53-54.) After securing the left side of the home, the officers moved to the bedroom where they believed Badback was passed out. (Tr. 53.) The door to the bedroom was

---

[1]The officers were able, however, to contact Assistant United States Attorney Trina Higgins sometime during the night to obtain authorization to arrest Badback based on probable cause that he was a felon in possession of a firearm in violation of federal law. (Tr. 67.)

slightly open.  Chief Toersbijns entered with his flashlight and saw Badback lying on the bed.

(Tr. 54.)  Chief Toersbijns identified himself as a police officer, and instructed Badback to raise

his hands and not to move.  (Tr. 54.)  Another officer turned the light on and Badback began to

awaken and put his arms in the air.  (Tr. 54-55.)  The officers then placed Badback in restraints.

(Tr. 55.)

Next to Badback on the bed was an open gun case containing a handgun.  *Id*.  After

restraining Badback, one of the officers picked up the gun to secure it.  (Tr. 57.)  He removed the

magazine from the gun, which still contained live rounds, and pulled the slide back causing a

round to fall out of the chamber.  *Id*.  Badback was then escorted out of the home and the gun

was placed back on the bed.  (Tr. 55, 58.)  The gun was later seized by one of the FBI agents.

(Tr. 58.)

**Analysis**

In order for police officers to lawfully enter a residence they must have either a warrant

or "probable cause plus exigent circumstances."  *Kirk v. Louisiana*, 536 U.S. 635, 636 (2002).

Exigent circumstances include the "hot pursuit of a fleeing felon, or imminent destruction of

evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other

persons inside or outside of the dwelling."  *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)

(citations omitted).  The government argues that the warrantless entry in this case was justified

by the risk of danger the situation posed to both the police and the public.

In determining whether a risk of danger to police officers and others amounts to exigent

circumstances, the Tenth Circuit employs a two-part test: "whether (1) the officers have an

objectively reasonable basis to believe there is an immediate need to protect the lives or safety of

themselves or others, and (2) the manner of the search and scope is reasonable." *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006).  The operative term in this test is immediate.

For example, in *Brigham City, Utah v. Stuart*, 547 U.S. 398, the United States Supreme Court upheld a warrantless entry into a home where police could hear and see an ongoing altercation occurring inside.  *Id*. at 406.  The Supreme Court explained that "[i]n these circumstances, the officers had an objectively reasonable basis for believing . . . that the violence in the kitchen was just beginning."  *Id*.

Similarly, in *United States v. Najar*, 451 F.3d 710 (10th Cir. 2006), a police dispatcher received a 911 hang up call.  *Id*. at 715-16.  The dispatcher made four call back attempts that all resulted in answers and hang ups.  *Id*. at 716.  Upon arriving at the home, police could hear and see someone inside, but received no response when they loudly knocked and announced their presence.  *Id*.  Eventually the officers were met at the front door by an uncooperative occupant who refused to allow admission.  *Id*. at 716-17.  Fearing for the safety of other occupants, the officers entered the home without a warrant and discovered a shotgun and a woman face down on the bedroom floor.  *Id*. at 717.  In upholding this warrantless entry, the Tenth Circuit noted that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  *Id*. at 714 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).  Again, the operative term being immediate.

In the present case, no such immediacy existed to justify the warrantless entry.  By 12:00 a.m., Officer Root was aware that Badback was intoxicated and in possession of a firearm at his home on Mesa View Drive.  Over the next four-hour period, Officer Root and others from the

BIA were able to round up law enforcement officers from three different agencies: (1) the BIA; (2) the FBI; and (3) the San Juan County Sheriff's Office.  These officers found sufficient time to travel long distances, hold meetings, plan strategy, and to call an Assistant United States Attorney in Salt Lake City.  Yet these officers claim that they did not have time to make a simple phone call to a magistrate judge to obtain a warrant.

From 12:30 a.m., when officers first arrived at Badback's home, to the time of entry over three-hours later, Badback was not observed making threats, brandishing a gun, or shooting a weapon.  To the contrary, police believed that Badback was passed out alone in his bedroom.

The facts of this case do not present the type of dynamic situation envisioned by the exigent circumstances exception.  The prolonged period of planning, the attempted entry and then retreat to a central location away from Badback's home, all while the officers knew that the Defendant was passed out, flies in the face of any argument of a need for immediate action. Significantly, not once during this four-hour period did any officer even attempt to obtain a warrant.  The warrantless entry of Badback's home was in violation of the Defendant's rights under the Fourth Amendment, and the evidence obtained therefrom must be suppressed. Defendant's motion to suppress is GRANTED.

**IT IS SO ORDERED.**

DATED this 11th day of August, 2008.

Dee Benson
United States District Judge